## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROLL CALL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. _____ |
| | ) |
| ROLL CALL STRATEGIES, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff Roll Call, Inc. ("Roll Call") seeks preliminary injunctive relief in order to stop

defendant Roll Call Strategies from continuing to infringe upon the trademarks owned by Roll

Call and to enforce the parties' agreement requiring Roll Call Strategies to change its name and

mark in order to cease such infringement.

Since 1955, Roll Call has published the well-known newspaper *Roll Call – The*

*Newspaper of Capitol Hill.* It owns three federally-registered trademarks, including ROLL

CALL, ROLL CALL (and Design), and ROLL CALL THE NEWSPAPER OF CAPITOL HILL

(and Design). Each registration covers a "twice weekly newspaper reporting on the legislative

and political activities of Congress, members of Congress and their campaigns, congressional

employees, and other matters of interest to people who work or live on Capitol Hill." See

Declaration of Adam M. Chud ("Chud Decl.") ¶ 11 and Exhibit C thereto.

Defendant Roll Call Strategies, LLC ("Roll Call Strategies") is a lobbying firm founded

in 2005 by a former Congressional staffer and his colleagues. See Chud Decl. ¶¶ 13-14 and

Exhibits I-J thereto. To date, it has registered to lobby Congress on behalf of seven clients on a broad spectrum of political issues, including treasury, homeland security, commerce, justice, appropriations, federal permitting, taxation, transportation, labor, and health and human services – all issues upon which Roll Call routinely reports. See Chud Decl. at ¶ 12 and Exhibit H thereto. In order to gain instant name recognition and credibility for a new and completely unknown business, Roll Call Strategies made the dominant feature of its name and mark something that it knew was well respected in political circles in Washington, D.C. and around the country: ROLL CALL.

By flagrantly and transparently trading on Roll Call's good name, Roll Call Strategies has plainly infringed the trademarks owned by Roll Call. That infringement is especially troublesome because of the types of businesses each party operates. Plaintiff publishes a newspaper that reports in an unbiased manner about politics, politicians, and political campaigns. In order to maintain both actual independence from those who advocate on behalf of a certain side of political issues and the appearance of such independence, Roll Call does no lobbying and is not affiliated with any individual or organization that does so. By registering under the ROLL CALL STRATEGIES mark to lobby Congress on behalf of clients on a wide variety of issues, Roll Call Strategies threatens to jeopardize Roll Call's reputation for independence by giving the impression that Roll Call now has a lobbying arm. That is the type of confusion that trademark law seeks to prevent, and which must be stopped here.

When Roll Call first learned in October 2005 that Roll Call Strategies existed and had registered to lobby Congress, Roll Call's counsel sent a letter to Roll Call Strategies demanding that Roll Call Strategies stop infringing on its trademarks. See Chud Decl. ¶ 2 and Exhibit A thereto. That demand led Roll Call Strategies to agree on November 29, 2005 to stop using the

ROLL CALL STRATEGIES name and mark, change its name and mark for all purposes to CR STRATEGIES, LLC, and to do so "without delay." Chud Decl. ¶ 8 and Exhibit C thereto. After Roll Call stood down and forewent bringing this action in reliance on that agreement, on December 20, 2005, Roll Call Strategies declared that it would not make that agreed-to change, and proposed to adopt a different name and mark that would continue to include the mark ROLL CALL or an abbreviation thereof. See Chud Decl. ¶ 10 and Exhibit F thereto. As of this date, defendant continues to operate and lobby Congress using the name and mark ROLL CALL STRATEGIES.

Roll Call has therefore brought claims against Roll Call Strategies under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) & (c) and the District of Columbia Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3904, *et seq.*, and for breach of contract. Although Roll Call seeks several forms of relief for these violations, at this time it asks the Court to enter preliminary injunctive relief restraining Roll Call Strategies from infringing on Roll Call's federally-registered trademarks and enforcing the parties' contract. As discussed below, all of the requirements for such relief are met here.

## STATEMENT OF FACTS

The relevant facts are detailed in the Verified Complaint and the Chud Declaration that are being filed this day. Plaintiff hereby incorporates those facts herein as if fully written.

## ARGUMENT

The standards for granting a preliminary injunction are well-established. The party seeking the preliminary injunction must show:

> "(1) that he is substantially likely to succeed on the merits of his suit, (2) that in the absence of an injunction, he would suffer irreparable harm for which there is no adequate legal remedy, (3) that the injunction would not substantially harm other parties, and (4) that the injunction would not significantly harm the public interest."

- 3 -

*Taylor* v. *Resolution Trust Corp.*, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995). "Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa*." *Cuomo* v. *United States Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (*per curiam*). Here, these factors clearly weigh in favor of preliminarily enjoining Roll Call Strategies from infringing upon Roll Call's trademarks.

## I.    ROLL CALL IS LIKELY TO SUCCEED ON THE MERITS.

### A.    Success Is Likely On The Likelihood of Confusion Claims.

In order to prove trademark infringement under 15 U.S.C. § 1114, or false designation of origin under 15 U.S.C. § 1125(a), the plaintiff must show "(1) that it owns a valid trademark, (2) that the mark is distinctive on its own or that it has acquired secondary meaning, and (3) that there is a likelihood of confusion." *Appleseed Found., Inc.* v. *Appleseed Inst., Inc.*, 981 F. Supp. 672, 675 (D.D.C. 1997). See also *Malarkey-Taylor Assocs., Inc.* v. *Cellular Telecomm. Indus. Ass'n*, 929 F. Supp. 473, 475-76 (D.D.C. 1996) (same); *Sears, Roebuck & Co.* v. *Sears Fin. Network, Inc.*, 576 F. Supp. 857, 860 (D.D.C. 1983) (elements of both causes of action are the same). Here, all three requirements are easily met.

#### 1.    The ROLL CALL Marks are Valid and Strong.

There is no doubt that the ROLL CALL marks are valid. Roll Call owns federal registrations for the trademark ROLL CALL, as well as two other marks that incorporate the ROLL CALL mark. This fact alone shows that Roll Call is likely to prevail on the merits of its trademark infringement claim. See *Crime Control, Inc.* v. *Crime Control, Inc.*, 624 F. Supp. 579, 581 (D.D.C. 1984) (where "plaintiff is the undisputed owner of the registered mark, the likelihood of the plaintiff's succeeding on the merits of the case is strong"). The ROLL CALL

marks have also achieved incontestable status, further confirming that they are valid. *See* 15

U.S.C. § 1065.

The ROLL CALL marks are also distinctive. Federal registration of a mark is "*prima*

*facie* evidence" that the mark "is distinctive of [the plaintiff's] products in commerce."

*Malarkey-Taylor*, 929 F. Supp. at 476. Further, "a mark is presumptively distinctive if it is either

fanciful, arbitrary, or suggestive" (in contrast to marks that are generic or descriptive).

*Appleseed*, 981 F. Supp. at 675; *Am. Ass'n for Advancement of Science* v. *Hearst Corp.*, 498 F.

Supp. 244, 254 (D.D.C. 1980) ("*AAAS*") (these types of marks "are inherently distinctive and

receive legal protection immediately upon adoption and use"). Arbitrary marks are "real words

that do not describe or suggest the products to which they are attached." *Id.*; *Blinded Veterans*

*Ass'n* v. *Blinded Am. Veterans Found.*, 872 F.2d 1035, 1040 (D.C. Cir. 1989) ("An arbitrary term

is one which is commonly used in the language, but has no intrinsic connection to the product.").

ROLL CALL is an arbitrary mark, because it does not describe the products to which it relates

and has no other intrinsic connection to a newspaper or any quality of a newspaper. *Malarkey-*

*Taylor*, 929 F. Supp. at 476.[1]  For these reasons, the ROLL CALL marks are distinctive.

While secondary meaning is not strictly required because the ROLL CALL marks are

distinctive, here, the ROLL CALL marks have acquired secondary meaning "because the

relevant market associates" ROLL CALL with plaintiff. *Russian Academy of Sciences* v. *Am.*

*Geophysical Union*, No. 98-2165(TFH), 1998 U.S. Dist. LEXIS 20598, at \*12-13 (D.D.C. Dec.

16, 1998). "'Secondary meaning'" constitutes an association in the minds of the buying public

between the name of the product and the product itself or its source." *AAAS*, 498 F. Supp. at

---

[1] The next rung down the ladder of trademark protection is "suggestive" terms, which are "terms that do not directly describe a product or service, but suggest some quality of the article." *Blinded Veterans Ass'n*, 872 F.2d at 1040. Even if ROLL CALL was merely suggestive, however, it would remain presumptively distinctive, as *Appleseed* and *AAAS* hold.

256. Because the ROLL CALL marks are registered on the PTO's principal trademark register, such registration "is prima facie evidence of the fact of its having acquired secondary meaning." *Id.* Other indicia of secondary meaning include "the duration and continuity of use of the mark," "the extent of advertising and promotion and amount of money spent thereon," "figures showing sales of plaintiff's product or number of people who have viewed it," and "identification of plaintiff's and defendant's respective markets." *Id.* at 257. Here, Roll Call has used the ROLL CALL marks for over 50 years. See Verified Complaint ¶¶ 1, 12. It expends hundreds of thousands of dollars annually to promote the ROLL CALL marks. *Id.* ¶ 14. It has over 18,000 subscribers to the print and on-line editions of the newspaper. *Id.* ¶ 13. And the markets for the newspaper and defendant's services are the same: those who work in politics on Capitol Hill, and across the country. All of the indicia of secondary meaning are therefore present.

## 2. ROLL CALL STRATEGIES is Likely to be Confused with ROLL CALL.

There is a strong likelihood of confusion from the use of the ROLL CALL mark by Roll Call Strategies. Confusion may be likely even if the two users are not in "direct competition." *Foxtrap, Inc.* v. *Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982). Instead, the question is "whether the buying public is likely to believe that defendant's services come from the same source, or are affiliated with the trademark owner." *Id.*[2] Courts look to several factors to determine whether confusion is likely, including "(1) the strength of the senior user's mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, and (4) the intent of the junior user." *Appleseed*, 981 F. Supp. at 675. See also *Sears*, 576 F. Supp. at 862 (same factors).

---

[2] See also *Appleseed*, 981 F. Supp. at 675 (confusion is likely when "consumers in the relevant product market are likely to believe that defendant's products or services come from the same

Here, these factors confirm that confusion is likely.

### a.     The ROLL CALL Marks are Strong.

There are several reasons why the ROLL CALL marks are strong. As discussed above, the marks are distinctive. See *Malarkey-Taylor*, 929 F. Supp. at 477 (distinctive marks deemed strong). The ROLL CALL marks also have acquired secondary meaning. They have universal name recognition in the field of politics. See Verified Complaint ¶¶ 12-13, 16. Roll Call's subscriber base is broad: there are over 14,000 subscribers to *Roll Call – The Newspaper of Capitol Hill* in Washington, D.C. alone, it is delivered to every Congressional office, and there are thousands of additional subscribers across the nation. *Id.* ¶ 13. The mark has been used continuously for over five decades. *Id.* ¶¶ 1, 12. And plaintiff spends hundreds of thousands of dollars annually to foster the identification between the ROLL CALL marks and plaintiff's newspaper. See, *e.g.*, *Sears*, 576 F. Supp. at 862 (length of use and resources expended contributed to finding that mark was strong).

### b.     The mark ROLL CALL STRATEGIES is Virtually Identical to the ROLL CALL Marks.

Defendant's ROLL CALL STRATEGIES mark shares the same "dominant feature" – the words ROLL CALL – with Roll Call's famous ROLL CALL marks. The marks are therefore "strikingly similar." *Appleseed*, 981 F. Supp. at 676. See also *AAAS*, 498 F. Supp. at 259 ("although the marks may have minor differences, confusion may be likely if the dominant portion of both marks is the same"). This conclusion is confirmed by the fact that Roll Call Strategies has already been referred to in the press by the abbreviated name and mark ROLL CALL. See Chud Decl. ¶ 14 and Exhibit J thereto.

---

source or are affiliated with plaintiff"); *AAAS*, 498 F. Supp. at 258 (the question "is not whether people will confuse the marks but whether the marks will confuse people").

"The test [for likelihood of confusion] is ... whether 'the impression which the infringing mark makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trademark.'" *Sears*, 576 F. Supp. at 862 (citation omitted). Here, the marks create the impression that they come from the same source because defendant's name merely adds the word "STRATEGIES" onto plaintiff's mark. That difference does not eliminate the likelihood of confusion. See, *e.g.*, *Russian Academy of Sciences*, 1998 U.S. Dist. LEXIS 20598, at *27 (journal "Geomagnetism and Aeronomy International" not distinguishable from "Geomagnetism and Aeronomy"). If a media consulting firm opened and called itself "New York Times Strategies," there would be no doubt that consumers would think that the junior user was affiliated with the senior user. The same is true here. If anything, the addition of the term "STRATEGIES" *adds to* the confusion, as it connotes that Roll Call now provides consulting and lobbying services – which it does not – and the perception of which is terribly damaging to the sterling reputation that Roll Call enjoys.

c.    **The Product Markets are the Same.**

*Roll Call – The Newspaper of Capitol Hill* is a newspaper with its primary subscription base being Capitol Hill. It has subscribers in every state as well. Roll Call Strategies has registered to lobby on Capitol Hill – in the very heart of Roll Call's primary market. Roll Call Strategies will lobby the exact same people who subscribe to and read the ROLL CALL newspaper: members of Congress and their staff. See, *e.g.*, *Malarkey-Taylor*, 929 F. Supp. at 477 (factor met where "the markets that each party wishes to serve overlap" and "[b]oth target their services" to the same markets).[3]

---

[3] Any operations by Roll Call Strategies in other states, namely in Kentucky where it is headquartered, will similarly overlap with the subscriber base for *Roll Call – The Newspaper of Capitol Hill*, as there are subscribers in every state, including Kentucky. Further, Roll Call owns the ROLL CALL marks nationally, not just in the District of Columbia.

- 8 -

d.    **Roll Call Strategies' Bad Intentions are Obvious.**

Roll Call Strategies had bad intentions when it chose that name. As a new lobbying firm,
it wanted a name that would be instantly recognizable to its potential customers (i.e., politicians
and their staff). Having worked for a Congressman, Roll Call Strategies' founder selected a
name that used the ROLL CALL marks with full knowledge of the goodwill, credibility, and
respect associated with the ROLL CALL marks. Under similar circumstances, courts easily infer
bad intent by the junior user. See *Sears*, 576 F. Supp. at 863 (where "it is hard to believe that the
defendant was unaware of the plaintiff's use of the ... name," courts will "infer[] that the
defendant's intent was to trade off the plaintiff's well-known name and mark."); *Mobil Oil Corp.*
v. *Pegasus Petro. Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (cited in *Russian Academy of
Sciences*) (where the court "can perceive freedom of choice with full knowledge of a senior
user's mark, [it] can readily read into defendant's choice of a confusingly similar mark the intent
to get a free ride upon the reputation of a well-known mark"); *Malarkey-Taylor*, 929 F. Supp. at
478 (intent was "not completely innocent").

For all of these reasons, Roll Call is likely to succeed on its trademark infringement and
false designation of origin claims.

**B.    Success Is Likely On The Breach Of Contract Claim.**

Roll Call has also brought a breach of contract claim against Roll Call Strategies because
it has reneged on its agreement to change its name and mark to CR STRATEGIES, LLC for all
purposes, and to do so "without delay." Roll Call is likely to prevail on this claim.

The elements of a breach of contract claim "are the formation of the contract and its
breach." *In re: Minister Papandreou*, 139 F.3d 247, 252 (D.C. Cir. 1998). Here, the parties
entered into a contract. After Roll Call demanded that Roll Call Strategies stop infringing on the
ROLL CALL trademarks, the parties reached a verbal agreement under which Roll Call

- 9 -

Strategies would change its name and mark to CR STRATEGIES, LLC. The agreement was confirmed in writing by a letter from Roll Call Strategies' counsel, which stated that the change would be made "without delay." See Chud Decl. at ¶ 8 and Exhibit C thereto. That agreement alone proves at a minimum that Roll Call Strategies recognizes that it cannot legally use a name that incorporates the ROLL CALL marks.

But Roll Call Strategies has breached the agreement. It expressed in its December 20, 2005 letter that it no longer intends to change its name and mark to CR STRATEGIES, LLC, as the parties had agreed. See Chud Decl. at ¶ 10 and Exhibit F thereto. It so stated shortly before the winter holidays, and three weeks after Roll Call had stood down and forwent bringing a trademark infringement lawsuit in reliance on the parties' agreement, assuming that the dispute had been resolved. Given that over a month has gone by since the parties made the agreement, and that Roll Call Strategies continues to operate under an infringing name and mark, it certainly has not made the change "without delay."[4]

---

[4] Roll Call Strategies' December 20, 2005 letter foreshadows a defense that it may raise: that its counsel simply misunderstood the direction of her client and passed along and then confirmed in writing the wrong agreement. This defense, if asserted, would fail. Ms. Conrad faxed her November 29, 2005 letter – which states the terms of the parties' agreement – to Mr. McCarthy. See Chud Decl. at ¶ 8 and Exhibit C thereto. Upon receiving the letter, Roll Call Strategies did *not* claim that counsel had misunderstood the agreement. If there had been a mistake, it would not have taken three weeks and a call from Roll Call's counsel asking about the status of the implementation of the agreement to identify the error. Moreover, the suggestion that Ms. Conrad misunderstood her client's offer is simply untenable. Ms. Conrad stated on November 29, 2005 that her client's offer was to (1) change its name and mark to CR STRATEGIES, LLC, (2) use that name in both the District of Columbia and elsewhere, and (3) to make the change "without delay." She now claims that there was a misunderstanding on her part as to *all three* agreements: that the change would be to KENTUCKY ROLL CALL STRATEGIES and its abbreviation KRCS – even though neither name was ever mentioned before December 20; that there would be a geographical distinction, as for work in Washington, D.C. the company would register to lobby as KCRS, and for work elsewhere it would operate as KENTUCKY ROLL CALL STRATEGIES, and that three weeks after the November 29 agreement, Roll Call Strategies had not in fact made any progress in changing its name. It is impossible to believe that Ms. Conrad got all of those instructions wrong (or that Roll Call Strategies would have continued to retain her as counsel if she did).

- 10 -