Roll Call Strategies' December 20, 2005 letter not only expressed that it would not abide by the parties' agreement, but it also proposed to change its name and mark to something other than that which the parties agreed: to KENTUCKY ROLL CALL STRATEGIES, LLC, but to register to lobby in Washington, D.C. as KRCS, and to add a disclaimer to its "web site and promotional literature" stating that it was not affiliated with Roll Call. That letter unequivocally expressed that Roll Call Strategies has breached and will continue to breach the agreement. It also inappropriately attempted to reopen negotiations over different suggested names that would themselves continue to infringe upon Roll Call's trademarks.

The proposal is technically irrelevant to this action because, to date, defendant continues to use the name and mark ROLL CALL STRATEGIES and therefore continues to violate the Lanham Act, the DCCPPA, and the parties' agreement. The December 20 letter provides no basis for refusing to issue the requested preliminary injunction, because the offer included therein has not been accepted and the violations by Roll Call Strategies continue.

While the proposal is legally irrelevant, such offers put the senior trademark user into a bind because the infringer can always attempt to avoid an injunction by proposing to change from the complained-of infringing name and mark to something else. In such circumstances, the *infringer* has a "[h]eavy burden" to show "that potential confusion has been allayed by subsequent changes." *Appleseed*, 981 F. Supp. at 678. Roll Call Strategies cannot meet that burden for two reasons: first, it has not in fact made any change to its name, and second, its most recent proposal would continue the practices challenged in the Verified Complaint.

In fact, defendant's latest unacceptable proposal is no different from earlier offers that it made, and which Roll Call rejected. During the discussions that led up to the November 29 agreement, Roll Call Strategies had several times proposed new names that would have

continued to use the mark ROLL CALL (such as ROLL CALL VOTE STRATEGIES) and to use abbreviated names for its work in the District (including RC GOVERNMENT RELATIONS). See Chud Decl. ¶¶ 4, 6. Roll Call rejected those proposals because continuing to incorporate the ROLL CALL marks into the company name would continue to violate Roll Call's rights in the marks, and the abbreviation was a transparent effort to continue infringing upon the marks and would not break the association with the marks. See Chud Decl. at ¶¶ 5, 7 and Exhibit B thereto.

The latest offer does not alleviate any of these problems; in fact, it exacerbates them. If defendant were to operate as KENTUCKY ROLL CALL STRATEGIES, it would continue to use the ROLL CALL mark in its name. The dominant feature of the name would remain the words ROLL CALL, which is a registered trademark owned by Roll Call. The new name would merely connote that Roll Call has a Kentucky branch, which it does not. Further, changing the "legal name" would be an incomplete solution. Based on the limited information that Roll Call has about Roll Call Strategies, we know at least that defendant uses the ROLL CALL marks not only as part of its legal name, but also for its web site (www.rollcallstrategies.com), in its e-mail addresses (johndoe@rollcallstrategies.com), and as the greeting by its receptionist and on its answering machine. See Chud Decl. ¶ 15. So an offer to change the legal name would not stop the infringement. Finally, the addition of a geographic descriptor is irrelevant. Roll Call owns the trademarks, so it has the right to use the marks nationwide, even in Kentucky. See n.3 *supra*. And, the proposed change would not break the logical inference that defendant's work is connected to Roll Call. See, *e.g.*, *Foxtrap*, 671 F.2d at 640-41 (court was "skeptical" that "descriptive legend" denoting geography (Foxtrap versus Foxtrap of Philadelphia) would avoid

likelihood of confusion because it "would do little to counter any impression that the two establishments might be related to one another, or even branches of the same enterprise").

Defendant's proposal to abbreviate KENTUCKY ROLL CALL STRATEGIES to KRCS for its federal lobbying registration has no practical value. It is not an offer to actually lobby under that abbreviated name, but only to register to lobby under that name. Nor is it an offer to use only materials that include the abbreviation, or to represent the company in lobbying contacts only with that abbreviation. And the proposed geographic distinction is a mirage. Even if lobbying contacts are made using the name KRCS, anyone who calls defendant's office will quickly learn what KRCS stands for. The web site and e-mail addresses will remain the same. So merely registering to lobby under an abbreviation of words that include the ROLL CALL marks is no solution at all.

Finally, the disclaimer that defendant offered to provide on certain of its materials would be wholly ineffective. When an infringer offers to use a disclaimer, the defendant has a "heavy burden … to come forward with evidence sufficient to demonstrate that any proposed materials would significantly reduce the likelihood of consumer confusion." *Home Box Office, Inc.* v. *Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987). This burden-shifting "alleviates the unnecessary hardship that could be imposed on [plaintiff] if it repeatedly had to catch up with [defendant's] use of its trademark by adequately demonstrating that each new permutation of the [mark] and its context was likely to mislead consumers." *Id.* Here, the disclaimer would be of minimal value. It would be limited to defendant's web-site and promotional materials. But the disclaimer plainly could not be communicated each time someone from defendant's organization made a lobbying or other business contact, answered the

phone, or sent an e-mail. Nor has defendant proposed to do so. The disclaimer therefore would not eliminate the likelihood of confusion.

As things stand, defendant continues to operate using the name and mark ROLL CALL STRATEGIES, which not only continues to violate Roll Call's rights in the ROLL CALL trademarks, but also breaches the parties' agreement that Roll Call Strategies would change its name and mark to CR STRATEGIES, LLC.

### C. Success Is Likely On The Trademark Dilution Claim.

Roll Call has also brought a claim against Roll Call Strategies under 15 U.S.C. § 1125(c) for trademark dilution. This claim has three elements: that the plaintiff owns a "distinctive and famous" mark, that "defendant adopted its mark after plaintiff's became famous," and "that defendant's mark dilutes the famous mark." *Appleseed*, 981 F. Supp. at 676-77. Roll Call is likely to prevail on the merits of this claim.

First, the ROLL CALL marks are distinctive and famous. For the reasons set forth above (at 5), the marks are distinctive because they have been registered with the PTO and because they are arbitrary marks. They have also acquired a strong secondary meaning. See *supra* at 5-6. The marks are also famous. Section 1125(c) provides eight "factors" to determine whether a mark is famous, including:

> "(A) the degree of inherent or acquired distinctiveness of the mark;
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
> (C) the duration and extent of advertising and publicity of the mark;
> (D) the geographical extent of the trading area in which the mark is used;
> (E) the channels of trade for the goods or services with which the mark is used;
> (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
> (G) the nature and extent of use of the same or similar marks by third parties; and
> (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

All eight (8) factors establish that the ROLL CALL marks are famous. First, the marks are distinctive. See *supra* at 5. Second, they have been used for over 50 years. Verified Complaint ¶¶ 1, 12. Third, considerable resources have been expended to advertise and publicize the ROLL CALL marks. *Id.* ¶ 14. Fourth, the marks are used nationwide. *Id.* ¶ 13. Fifth, the marks relate to the same field of politics in which defendant operates. Sixth, the marks have received universal recognition in their field. *Id.* ¶¶ 12-13, 16. Seventh, no other user of the same or similar marks have entered the field, as far as we know. And eighth, the marks are on the PTO's principal trademark register. *Id.* ¶ 17; Chud Decl. ¶ 11 and Exhibit G thereto.

The second requirement under § 1125 is that defendant started using the mark after the mark became famous. This element too is satisfied here. There is no question that the ROLL CALL marks became famous at least as of 1993 (when they were registered with the PTO), and likely long before then. For these purposes, it matters only that the marks became famous before Roll Call Strategies began operating in 2005, which they certainly were.

Finally, plaintiff is likely to prevail on this claim because "defendant's mark dilutes the famous mark[s]." *Appleseed*, 981 F. Supp. at 677. Dilution of a mark may occur by "blurring," where use of a mark by a junior user would "weaken the commercial magnetism of [the mark] and diminish [its] ability to evoke [its] original associations." *Nissan Motor Co.* v. *Nissan Computer Corp.*, 378 F.3d 1002, 1012 (9th Cir. 2004); *Appleseed*, 981 F. Supp. at 677 n.5. Examples include "the use of DUPONT for shoes, BUICK aspirin, and KODAK pianos." *Nissan*, 378 F.3d at 1012 (citing H.R. Rep. No. 104-374, at 3 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 1029, 1030). Dilution may also occur by "tarnishment," where the junior user's use of a mark damages the reputation of the senior user. *Appleseed*, 981 F. Supp. at 677 n.5. By guarding against trademark dilution, § 1125(c) protects a mark from being "weakened because

the relevant public now also associates that designation with a new and different source. … Thus, where the classic likelihood of confusion test leaves off, the dilution theory begins." *Fed. Express Corp.* v. *Fed. Espresso, Inc.*, 201 F.3d 168, 175 (2d Cir. 2000) (quotation omitted).

Here, Roll Call Strategies' use of the ROLL CALL marks will dilute the marks. If Roll Call Strategies is permitted to continue to use the marks, there will be a "whittling away at the value" of the ROLL CALL marks because they will be used to identify not just Roll Call, but a different source as well. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24.71 at 24-147 (2005). Roll Call is now directly and only associated with *Roll Call – The Newspaper of Capitol Hill*. Use of the ROLL CALL by a lobbying firm would blur the marks' intimate and sole association with the newspaper, which is exactly the type of conduct that the statute condemns. Roll Call Strategies' conduct will also tarnish the ROLL CALL marks because, by connoting that Roll Call now has a lobbying arm, it jeopardizes the appearance of objectivity that Roll Call has long sought to maintain.

## II. WITHOUT PRELIMINARY INJUNCTIVE RELIEF, ROLL CALL WILL BE IRREPARABLY HARMED.

If Roll Call Strategies is permitted to continue infringing on Roll Call's trademarks, Roll Call will be irreparably harmed. Once the Court finds that Roll Call is likely to succeed on its trademark infringement claim, the Court should presume that irreparable harm is likely, as "[t]rademark infringement raises a presumption of irreparable harm." *Malarkey-Taylor*, 929 F. Supp. at 478. This is because "[t]rademark infringement by its very nature causes irreparable harm." *Appleseed*, 981 F. Supp. at 677. See also *Sears*, 576 F. Supp. at 864 ("Trademark infringement and unfair competition are, by their very nature, activities that cause irreparable harm.").

The harm will occur in several ways. Continued use of the marks by Roll Call Strategies "could lead to dilution of the distinctiveness of the … mark and loss of control over [Roll Call's] reputation," which are "harms not compensable in money damages." *Malarkey-Taylor*, 929 F. Supp. at 478. Once an infringer starts using a mark, there is very little the owner of the mark can do, short of stopping the infringement, to protect all of the intangible interests that trademark protection provides. If the infringement continues, Roll Call will have no way to get back the distinctive quality of its marks, to know how many people incorrectly believe that Roll Call is now operating a lobbying group, or to determine how much it has been damaged. This harm is magnified in a situation such as this where the very business in which the infringer is operating (here, political lobbying) is fundamentally incompatible with the business that the owner of the trademark operates (here, publishing an objective, impartial political newspaper). Under such circumstances, a preliminary injunction is appropriate. See, *e.g.*, *Sears*, 576 F. Supp. at 864 ("[t]o prevent irreparable harm to Sears by the dilution of the distinctiveness of its trademark, the loss of control of its reputation and the diminishment of its good will, a preliminary injunction must be granted").

## III. A PRELIMINARY INJUNCTION WOULD NOT SUBSTANTIALLY HARM OTHERS.

Under the Lanham Act, when trademark infringement or dilution occurs, "injunctive relief is the normal remedy." *Appleseed*, 981 F. Supp. at 678. The Lanham Act therefore reflects Congress' decision that the benefits of stopping trademark infringement outweigh any harm to the infringer. As the court noted in *Appleseed*, the statute recognizes that "[i]t is inevitable that defendants will suffer some hardships, but these hardships are outweighed by the confusion that will likely result from having [multiple similar marks] and by plaintiff's loss of control over its reputation." 981 F. Supp. at 678. Therefore, any harm to Roll Call Strategies by

having to change its name to something that does not infringe upon Roll Call's trademarks would necessarily be outweighed by the interests that Roll Call has in those marks.

In fact, however, there would be virtually no harm to Roll Call Strategies if it was forced to change its name. Because Roll Call Strategies began operating only recently, its name is not so well established that a change would do any real harm. See, *e.g.*, *Appleseed*, 981 F. Supp. at 678 (no substantial harm to defendant when "it has been in operation for less than a year and has not become so associated with one name that it could not retain or recapture its goodwill"); *Russian Academy of Sciences*, 1998 U.S. Dist. Lexis 20598, at *30 (new publication was "not so associated with one name that it could not retain or recapture its goodwill"). Any minor disruption would pale in comparison to the loss of the distinctive quality of the famous ROLL CALL marks owned by Roll Call and the consumer confusion that such dual use of the ROLL CALL marks would create.

Moreover, requiring Roll Call Strategies to change its name would not prevent it from doing business; it would only prevent Roll Call Strategies from doing business under that name. In fact, Roll Call Strategies has acknowledged that it would not be unduly burdensome to change its name, as it agreed on November 29, 2005 to do so. Roll Call Strategies cannot now seriously contend that the process of changing names would do it any substantial harm.

Finally, any burden on Roll Call Strategies would be in the form of money damages, which the Court should not consider in assessing this factor. The costs of renaming a company are "compensable by money damages and thus do not constitute irreparable harm as a matter of law." *KOS Pharmaceuticals, Inc.* v. *Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004). This makes sense: it would defeat entirely the concept of trademark protection if an infringer could devote resources to the infringing use of the mark, and then avoid a remedy that would require it to stop

the infringement merely by claiming that it had expended those resources. See *id.* For these reasons, Roll Call Strategies would not be irreparably harmed if the Court were to issue a preliminary injunction.

## IV. A PRELIMINARY INJUNCTION WOULD NOT HARM THE PUBLIC INTEREST.

Finally, it would be in the public interest to stop Roll Call Strategies from infringing upon the trademarks owned by Roll Call. Trademark protection not only protects valuable intellectual property, but it prevents the public from being confused about the source of goods and services. For this reason, Courts have found that it is in the public interest to stop trademark infringement and prevent this confusion by the public. See *Crime Control*, 624 F. Supp. at 582 ("The public has a right not to be deceived or confused."); *Sears*, 576 F. Supp. at 865 ("It is within the public interest for the Court to take action to prevent public deception and confusion over the source or origin of businesses with which the public deals."); *Russian Academy of Sciences*, 1998 U.S. Dist. LEXIS 20598, at *31 ("it is in the public interest to prevent confusion over the source or origin of products provided to the public").[5]

Nor is there any public interest in permitting Roll Call Strategies to operate under that name. An injunction here would not prevent Roll Call Strategies from doing business altogether; it would just have to do so under a different and non-infringing name. See *Malarkey-Taylor*, 929 F. Supp. at 478-79. The public interest therefore favors the imposition of a preliminary injunction.

---

[5] There is also a strong public interest in ensuring the impartiality of news reporting (and the perception thereof), which Roll Call Strategies' use of the ROLL CALL marks threatens.

## CONCLUSION

The Court should enter the accompanying proposed Order and require Roll Call Strategies to immediately cease all use of the ROLL CALL marks, and change its name and mark to CR STRATEGIES, LLC, as the parties agreed.

Dated: January 12, 2006

Respectfully submitted,

John Moustakas (D.C. Bar No. 442076)
Adam M. Chud (D.C. Bar No. 468443)
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 346-4000
Fax: (202) 346-4444

*Attorneys for plaintiff Roll Call, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January, 2006, I caused the foregoing to be served upon the counsel below by e-mail and first-class mail, postage prepaid:

Lisa A. Conrad, Esq.
Ogden Newell & Welch, PLLC
1700 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202-2874

Adam M. Chud

LIBW/1539506.1